## GREAT SOUTHERN LIFE INS. CO. v. HEAVIN. (No. 10448.)

Court of Civil Appeals of Texas. Dallas. Nov. 12, 1929.

Rehearing Denied Dec. 7, 1929.

Vinson, Elkins, Sweeton & Weems, of Houston, for appellant.

David E. Coffman, of Dallas, for appellee.

JONES, C. J. Appellee, Mrs. Clara Roberta Heavin, instituted this suit against appellant, the Great Southern Life Insurance Company, in a district court in Dallas county, to recover on an insurance policy issued to James M. Heavin, deceased husband of appellee, together with interest, the statutory penalty of 12 per cent., and a reasonable attorney fee. The trial was to a jury, submitted on special issues, and on a verdict answering these special issues, judgment was rendered in favor of appellee for the sum of $4,098.57, with interest at the rate of 6 per cent. per annum from the date of the judgment. This judgment included the sum of $3,000, the face of the policy, interest at the rate of 6 per cent. per annum for the period of time that had elapsed from the maturity of the policy to the time of trial, 12 per cent. statutory damages for failure to pay the policy at maturity, and the sum of $600 as a reasonable attorney fee. From this judgment, appellant has duly perfected an appeal.

The following is deemed a sufficient statement of the facts for an understanding of the questions involved:

Appellee and the deceased were husband and wife at the time of deceased's death on May 4, 1927, and lived in their home at Royse City, Tex. On March 11, 1927, appellant duly issued on the life of deceased the insurance policy in suit, on the payment of the premium for the first year of $35.10, and for the further payment of premiums therein provided. The policy contained a provision that, "in case of the death of the insured by his own hand or hands, while sane or insane, within two years from the date of the policy, the company's liability shall be limited to the amount of the premium paid thereon." About 9 o'clock p. m. on the day of his death, the deceased was found by his wife lying in the rear of his residence in an unconscious and dying condition. She at once summoned the help of a neighbor, carried him into the house, and called physicians. The only physician that arrived before deceased's death was Dr. T. N. Roach, who arrived a few minutes before death. Dr. Roach pronounced the condition of deceased to be the result of carbolic acid poison taken internally. The only external injury that appeared on deceased was a dark-colored mark across the chin, which was described from its appearance to have been the result of a bruise. Dr. Roach based his diagnosis as to the cause of deceased's dying condition, when he examined him, on the facts that he detected the odor of carbolic acid coming from deceased, the appearance of white spots in his mouth and throat, which he character-

ized as burns from an acid, and also that the saliva in the mouth showed that carbolic acid had been taken therein. A number of neighbors at once came to deceased's home, and some of them claimed that, when they were near deceased, they detected the odor of carbolic acid.

Dr. R. R. Scott, who appears to have been the family physician, arrived shortly after the death of deceased, and also made an examination of the body of deceased, and as a result of the casual examination made by him testified that deceased did not die from carbolic acid poisoning. He based his conclusion on the fact that he found no carbolic acid burns around the mouth or upon the face of deceased, and that in his experience as a physician he had examined corpses, whose death was the result of carbolic acid taken internally, and always had found burns about the mouth and face; that there were no burns about the mouth or face of deceased.

The undertaker, who embalmed the body of deceased on the night of his death, after qualifying as an expert embalmer, and after stating his experience in embalming the bodies of persons who had died from carbolic acid poisoning, gave his opinion that the deceased did not die from carbolic acid poisoning. He based his opinion on the fact that, in cases where death had resulted from carbolic acid poisoning, he would be unable to withdraw the blood from the veins of such subjects, because of its coagulation, as a result of the poison, and would have much difficulty in getting the embalming fluid into the veins; that there was no difficulty in withdrawing the blood from deceased's body, and that he withdrew the usual amount of blood from his body, and experienced no difficulty in getting the fluid into the veins; that he detected no carbolic acid odor, and detected no burns about the face or mouth of deceased. Some others that were present and close to the body of deceased at the time testified they detected no carbolic acid odor.

E. M. Paulk, the local agent of appellant at Royse City, where deceased, in conjunction with another, operated a barber shop, was a lifelong friend of deceased, and appeared to be his business and confidential adviser, came to the house before deceased died. He also testified to the detection of carbolic acid odor, and after deceased's death at once advised the family to have his stomach removed and its contents submitted to chemical analysis, and was insistent that the course be taken. He communicated that night with Mr. Greenwood, of Dallas, appellant's president, and secured from him the authority to have such chemical analysis made, if consent of the relatives could be obtained, and if the expenses were not paid by the relatives, or by the county, appellant would pay such expenses. Paulk finally secured the reluctant consent of the wife of deceased for the removal of the stomach and

its chemical analysis. An order to this effect was also issued by the local coroner. The stomach was removed by a competent physician while the body was at the undertakers', and, after being properly tied to prevent the escape of its contents, was placed in a fruit jar and brought by the assistant undertaker to chemical laboratories in Dallas, and the contents of the stomach analyzed by a competent chemist. The result of this analysis showed a very small amount of free carbolic acid in the contents of the stomach, and other marks on the lining of the stomach which showed carbolic acid had been received into it.

The chemist testified that carbolic acid, when taken into the stomach, would be at once absorbed into the system, and that only a small amount of it would remain in a free state in the stomach. The chemist stated that the amount of the acid found by him was not sufficient in itself to cause death, but he gave as his opinion that the death of deceased was caused by carbolic acid poisoning. This opinion was based on the fact that the major part of the carbolic acid was at once absorbed, and that there were marks on the inner lining of the stomach that showed this fact. An ounce bottle, with a screw top and labeled "Carbolic Acid Poison," was found the next day in a small oat patch on the rear of appellee's premises, a distance of about 30 feet from where deceased was found the night before. A druggist of Royse City testified that, about 8 o'clock p. m. on the evening of his death, deceased had purchased from him an ounce bottle of carbolic acid. A coroner's inquest was held at the undertakers' place on the night of deceased's death, and later, after he had received a copy of the report of the chemist, returned a verdict that, in his opinion, the deceased "came to his death by carbolic acid poisoning, self-administered, and that his death was suicide."

Deceased had just completed and moved into a new home he had erected in Royse City. On the day of his death he had gone to Dallas for the purpose of buying two rugs to go into his home. He called on a brother-in-law of his in Dallas, held a short conversation with him, and was in a cheerful frame of mind. He returned to Royse City in the afternoon of the said day and worked at the barber shop until closing time. He seemed to be in a cheerful frame of mind during this time, and spoke of the nice rugs he had purchased in Dallas. About 7:30 in the evening he went home and told his wife of the purchase of the rugs, and apparently was in a very cheerful and hopeful frame of mind. The record discloses the fact that he had theretofore purchased and used carbolic acid for disinfectant purposes, and was very careful about having his home and chicken house disinfected regularly, and had used carbolic acid at times for this purpose.

The proof of death was prepared by E. M.

Paulk, the local agent of appellant, who had the insurance policy, along with other papers of deceased, in his office, and he was directed to prepare such proof of death by a letter written by Mr. Greenwood, appellant's president. Dr. Roach was the physician that gave his affidavit as to the cause of death, and stated the cause was from carbolic acid poison. This proof of death was signed and sworn to by appellee. After she had signed it, Paulk attached to the proof of death the statement and verdict of the coroner. Appellee was informed by the local agent, and also by Mr. Raines, superintendent of agencies for appellant, that appellant would not pay the insurance under the policy, because of the fact that deceased had committed suicide, and under the terms of said policy, $35.-10, the only premium that had been paid, was all appellant would pay.

About May 1, 1927, appellant, in pursuance of its conclusion that the death of deceased resulted from his intentionally taking carbolic acid poison, sent Raines, its superintendent of agencies, to the home of appellee, with instructions to tender to her a check for the sum of $35.10, in full payment of any claim she might have under the policy of insurance, and to secure from her a full release from all other claims. Raines visited the home of appellee, in company with Paulk, and after an explanation of the matter by Raines and Paulk, that if she accepted the check and signed the release she would surrender all claims against appellant under the policy, appellee accepted the check and executed the release. The release is as follows:

"Houston, Texas, May 21, 1927.

"Received from the Great Southern Life Insurance Company the sum of thirty-five and 10/100 dollars, which is hereby acknowledged to be in full payment of claims and demands under policy number 158302, issued on the life of James M. Heavin, deceased.

"[Signed] Mrs. Clara R. Heavin, Beneficiary.

"Witness: A. G. Raines. E. M. Paulk."

It appears that, at the time the policy was issued, the premium of $35.10 was advanced by the agent Paulk, the 50 per cent. due appellant was paid by Paulk, and his commission of the remaining 50 per cent. was entered in his book as a charge against deceased. On the next morning, after appellee received this check, she indorsed and delivered the same to Paulk in payment of this indebtedness, the money was paid to Paulk, and the actual consideration to appellee was the cancellation of this indebtedness incurred by her deceased husband. It does not appear that this fact was known to or contemplated by appellant when the check was delivered.

The petition on which this case was tried contains the usual allegations necessary to recover on a life insurance policy, to recover

the statutory damages of 12 per cent., and a reasonable attorney fee, and states a cause of action grounded on these claims. The answer of appellee was sufficient to state the defense under the policy of suicide of the deceased, and also to state the defense that appellee had theretofore compromised and settled all claims under the policy, and on a valid consideration had executed a release of all such claims, and set out, in hæc verba, the release. The answer also states the defense of misrepresentation in a matter material as to the risk covered by the policy, in that he had failed to state, in answer to a direct question on his medical examination, before the issuance of the policy, any physical ailments he had suffered from, when in fact he had suffered from a very material physical ailment not long previous to the issuance of the policy, in that, while working at the barber shop, he had fainted and become unconscious. This ground of defense appears to have been waived by appellant, in that no issue was submitted to the jury and none requested on this issue.

By supplemental petition appellee specially replied to the allegation that the release was a bar to recovery, and, among other allegations, urged failure of consideration for its execution, and that the release was secured by fraud and misrepresentation of appellant's agents, Raines and Paulk, specifically alleging the character of misrepresentation claimed to have been made. It was also pleaded that the release was executed on a mistake of fact, in that appellee at the time did not understand that she was releasing all claims under the policy.

The cause was submitted to the jury on special issues, and in response to these issues the jury found: (1) The deceased did not die as the result of carbolic acid self-administered; (2) E. M. Paulk did not represent to appellee that Dr. Scott, of Royse City, had told said Paulk that deceased had died from the effects of carbolic acid poison; (3) E. M. Paulk did not represent to appellee that the undertaker had stated to Paulk that deceased had died from the effects of carbolic acid poison; (4) E. M. Paulk did not represent to appellee that, under the terms of the insurance policy, if deceased had died as a result of carbolic acid poisoning, though taken accidentally, or by mistake, or through error, she could not collect any sum of money from appellant; (5) appellee did not know, at the time she executed the release, that she was in fact releasing all claims under the policy; (6) E. M. Paulk or Mr. Raines, at the time of the execution of the release, did disclose to appellee that she was signing a release of her claims against appellant under the insurance policy; (7) the sum of $600 is a reasonable attorney fee for appellee in this suit. All of these findings are supported by evidence, and this court is not authorized to

set them aside, but will treat them as facts established in this case.

■ Appellee's plea of failure of consideration for the execution of the release was not verified, but no exception, pointing out this failure, was submitted to the court, and no objection of evidence offered in support of this plea was made by appellant, because of lack of verification of the plea. Under the rule generally obtaining in this state, under such condition of the record, the higher court will treat the statutory requirement of verifying a plea of failure of consideration as having been waived by the other parties, and all assignments of error directed to this issue are overruled. Drew v. Harrison, 12 Tex. 279; Ashcroft v. Stephens, 16 Tex. Civ. App. 341, 40 S. W. 1038; Nasworthy v. Draper (Tex. Civ. App.) 28 S. W. 565; Capps v. Olive (Tex. Civ. App.) 26 S. W. 472; Farris v. U. S. Fidelity & Guaranty Co. (Tex. Civ. App.) 251 S. W. 612; Citizens' Garage Company v. Wilson (Tex. Civ. App.) 252 S. W. 186.

The serious contention made by appellant, and properly presented to this court, is that, in view of the finding of the jury against appellee's contention as to fraud and misrepresentation of appellant's agents, causing her to execute the release, and the further finding of the jury, to the effect that these agents, at the time of the execution of the release, explained to appellee its full effect, appellant was entitled to judgment on the finding of the jury. This contention must be sustained, if the release is based on what the law deems a valid consideration, unless the finding of the jury, to the effect that at the time appellee executed the release in question she did not know that she was in fact releasing all claims against the policy, would defeat such contention.

When appellant issued to deceased the insurance policy in suit, it contracted with deceased, if the policy was in force at the time of his death, to pay to appellee, the beneficiary named in the policy, the sum of $3,000, provided that, if deceased's death was occasioned by his own act, while sane or insane, within two years from its issuance, a return to appellee of the premiums paid would be the extent of appellant's obligation. Deceased died approximately two months after the issuance of the policy. There were very cogent facts and circumstances attending his death, which pointed to deceased's suicide. Under such condition, appellant concluded that its sole obligation to appellee, under the insurance contract, was to pay the liquidated sum of $35.10, the amount of the premium paid by deceased. Appellant never questioned the fact that it owed appellee this sum of money. So it tendered to appellee a check in such an amount in full discharge of the only obligation it recognized as due to appellee under the policy. It never paid this sum as any part of the $3,000 obligation in the policy, or in discharge of any part of

same, for it never recognized the fact that such obligation was brought into existence. With this payment as the sole consideration for its issuance, it demanded and received the release in evidence in this case. The amount of premium paid at the death of deceased was a liquidated demand in favor of appellee against appellant, provided the cause of the death of deceased was occasioned by suicide. The sum of $3,000, the face value of this contract of insurance, was a liquidated demand against appellant and in favor of appellee, provided suicide was not the cause of his death. Was the payment in question a valid consideration for the release of a claim by appellee for the principal sum named in the policy, to wit, $3,000, when the consideration given discharged no part of this obligation?

Appellant contends that, because there was a bona fide dispute, founded on the circumstances surrounding deceased's death, showing that this obligation for $3,000 never matured in favor of appellee, the release is based on a valid consideration, and is valid and binding on appellee. This contention is based on the rule of law that, even though a claim rests on a liquidated demand, yet if there is a bona fide dispute of the validity of the claim by the debtor, either in whole or in part, and the creditor accepts a smaller sum than the amount of the claim, in complete discharge of the claim, the creditor is bound thereby, and cannot be heard in a court to claim the remainder. Buford v. Construction Co. (Tex. Civ. App.) 279 S. W. 515; Christler v. Williams, 62 Tex. Civ. App. 169, 130 S. W. 608; Bergman Produce Co. v. Brown (Tex. Civ. App.) 156 S. W. 1102; and the authorities cited by these cases.

This line of decisions, however, does not decide this case, because this is not that character of a case. There were two conditions of recovery in this policy, neither one dependent upon the other, viz. one based on death by suicide; the other based on death not by suicide. Two distinct and different amounts are named under each condition of death, the one of death by suicide to be the amount of the premiums paid, and the other, of death not by suicide, to be the sum of $3,000. Appellee made the necessary proof of death and demand of the payment of $3,000. Appellant denied this demand, on the ground that the condition under which it was obligated to pay such a demand did not exist, but admitted its full liability under the other condition of death. If, under the former condition, appellant had tendered some portion of the $3,000 demand, by way of compromise on the disputed claim in reference thereto, and appellee had accepted and executed the release, then such release would have been on a consideration valid in law, and she would have been bound thereby. But appellant made no such tender, and made no payment of any amount of this $3,000, but

nevertheless contends that the release is valid as against any claim for such sum.

We think this case is similar to those cases in which a creditor's demand is made up of certain specific items, and the debtor pays one item of such claim, about which there is no dispute, and takes a release for the items which are in dispute. The authorities hold that the release executed under such a condition is not binding upon the creditor as to the disputed items. Fidelity & Casualty Ins. Co. of New York v. Mountcastle (Tex. Civ. App.) 200 S. W. 862; First Texas Prudential Ins. Co. v. Connor (Tex. Civ. App.) 209 S. W. 417; Woodall v. Pacific Mutual Life Ins. Co. (Tex. Civ. App.) 79 S. W. 1090.

■■ We therefore hold that the release in question was executed without a consideration deemed valid in law, and is not binding on appellee. Under this view of the case, it renders it unnecessary to determine the effect of any of the findings of the jury, other than the finding that deceased did not die from suicide, and the finding of $600 as a reasonable attorney fee. The record discloses that the notice, contemplated by the statute as a basis for the claim of the statutory damages of 12 per cent., and for the allowance of a reasonable attorney fee, was complied with by appellee. Under the evidence in the case, the amount of $600, found by the jury as a reasonable attorney fee, is amply sustained.

Finding no reversible error, it is the opinion of this court that this case should be affirmed; and it is so ordered.

Affirmed.